

# KEN PAXTON
#### ATTORNEY GENERAL OF TEXAS

December 14, 2015

The Honorable Robert L. Nichols
Chair, Committee on Transportation
Texas State Senate
Post Office Box 12068
Austin, Texas 78711-2068

Opinion No. KP-0046

Re: Authority of the Metropolitan Transit Authority of Harris County to participate in the Uptown Houston Transit Project otherwise known as the Post Oak Boulevard Dedicated Bus Lanes Project (RQ-0028-KP)

Dear Senator Nichols:

You seek our opinion on the authority of the Metropolitan Transit Authority of Harris County (METRO) to participate in the Uptown Houston Transit Project, otherwise known as the Post Oak Boulevard Dedicated Bus Lanes Project ("Project").[1]

In 2003, Harris County voters approved a referendum on METRO's transit authority system, including the METRO Solutions Transit System Plan ("Transit Plan"). *See Scarbrough v. Metro. Transit Auth. of Harris Cty.*, 326 S.W.3d 324, 327–29 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (discussing the referendum election, referencing METRO's Resolution No. 2003-93 and Resolution No. 2003-77, and acknowledging the voter's approval of the Transit Plan). The Transit Plan included a METRORail component that contained, among other segments, an Uptown/West Loop segment involving approximately 4.4 miles of commuter light rail along Post Oak Boulevard. *See* Notice of Special Election, METRO, at 1 (Resolution No. 2003-77 & Exhibits A, A-4).[2] You tell us that "[i]nstead of constructing light rail on Post Oak, the current project, which is a joint venture between the City of Houston, METRO and Uptown, intends to utilize the same approved light rail route along Post Oak but with a different technology, known as a Bus Rapid Transit." Request Letter at 1. You also tell us that the Project will "allegedly not be built or funded by METRO, but METRO will nevertheless fully participate in the Project by operating and maintaining the dedicated Project bus lanes and dedicated Project buses." *Id.* And you state that METRO will develop "bus specifications, operating plans, fare collection policy and systems, bus schedules and other system characteristics necessary to operate the dedicated bus service.

---

[1]*See* Letter from Honorable Robert L. Nichols, Chair, Senate Comm. on Transp., to Honorable Ken Paxton, Tex. Att'y Gen. at 1–2 (June 15, 2015), https://www.texasattorneygeneral.gov/opinion/requests-for-opinion-rqs ("Request Letter"). Your question is the same question that was before a court in *Cosmopolitan Condominium Owners Ass'n v. Metropolitan Transit Authority of Harris County*, No. 2015-34192 (270th Dist. Ct., Harris Cty., Tex. June 15, 2015). This cause has been dismissed by the court and the question is no longer in litigation. *See* Order of Dismissal (10/29/2015) (on file with the Op. Comm.).

[2]*Available at* https://ridemetro.org/METROPDFs/AboutMETRO/Referendum/Referendum2003-web.pdf.

METRO will also procure the dedicated buses." *Id.* You therefore question whether METRO's involvement in the Project is illegal "in that it would violate the contract METRO entered into with the voters via the 2003 referendum," given that the voters approved light rail on Post Oak. *Id.* at 2.

The "contract with the voters" doctrine stems from article I, section 16 of the Texas Constitution, which prohibits laws that impair the obligation of contracts. TEX. CONST. art. I, § 16 notes of decisions; *see San Saba Cty. v. McCraw*, 108 S.W.2d 200, 202–04 (Tex. 1937) (orig. proceeding). This doctrine is "grounded in . . . election orders and propositions." Tex. Att'y Gen. Op. No. JC-0400 (2001) at 5. Essentially, the election order calling for a bond election and establishing the purposes for which bonds will be issued becomes a contract with the voters once the voters approve the bonds. *See id.* Thus, proceeds of bonds approved by voters "may only be expended for the purpose for which they were approved." Tex. Att'y Gen. LO-98-060, at 2. "They may not be expended for an additional or different project." *Id.* When an election order states only a general purpose for which bonds will be issued and does not specify particular projects for which the proceeds will be used, the governing body is free to exercise its discretion in expending the funds within the scope of the general purpose. *Id.* at 2–3. Where the election order specifies the projects for which bond proceeds will be used, the proceeds can only be used for those projects and cannot be applied to other projects. *See id.* at 3; *see generally Fletcher v. Ely*, 53 S.W.2d 817, 818 (Tex. Civ. App.—Amarillo 1932, writ ref'd) (distinguishing discretion of governmental body to expend bond proceeds when bond proposal does not identify the specific road to be paved but indicates only that route must be between two points against its discretion when a proposal identifies the particular route and road to be paved).

Courts considering the question look to the relevant documents comprising the "contract with the voters" to ascertain the governmental body's intent with regard to the proceeds. *See City of San Antonio v. Headwaters Coal., Inc.*, 381 S.W.3d 543, 551 (Tex. App.—San Antonio 2012, pet. denied). Here, we consider METRO's resolutions calling for the 2003 special election.[3] *See id.* The resolution calling for the special election stated that the proposition to be submitted to the voters was

> a proposition to authorize METRO to issue bonds, notes, and other obligations payable, in whole or in part, from seventy-five percent (75%) of METRO's sales and use tax revenues for the acquisition, construction, repair, equipping, improvement or extension of METRO's transit authority system, including the METRO Solutions Transit System Plan, as described herein, which includes bus service expansions and construction of extensions of METRO's rail system known as "METRORail," to *approve such plan and construction of the METRORail and commuter line components thereof*, and to dedicate twenty-five percent (25%) of METRO's sales and use tax

---

[3]Initially approved on August 18, 2003, METRO Resolution No. 2003-77 called for a special election. *See* Notice of Special Election, METRO, at 1 (Resolution No. 2003-93 & Attachment 1, Resolution No. 2003-77), *supra* note 2. METRO Resolution No. 2003-93, approved on August 28, 2003, approved, adopted, ratified, and confirmed the August 18, 2003 resolution. *See id.*

> revenues through September 30, 2014, for street improvements and mobility projects, as authorized by law and with no increases in the current rate of METRO's sales and use tax . . . .

Notice of Special Election, METRO, at 1 (Resolution No. 2003-93 & Attachment 1, Resolution No. 2003-77) (emphasis added). The ballot language sought voter approval of

> [a]uthorization of METRO to issue bonds, notes and other obligations payable, in whole or in part, from 75% of metro's sales and use tax revenues in an aggregate principal amount not to exceed $640,000,000 for METRO's transit authority system, including the metro solutions transit system plan . . ., which includes bus service expansions . . . and construction of extensions and new segments of metro's rail system known as "metrorail," *approval of such plan and construction of all segments of the metrorail and commuter line components* . . . , and dedication of 25% of metro's sales and use tax revenues through September 30, 2014, to street improvements and related projects, as authorized by law, and with no increase in the current rate of metro's sales and use tax.

*Id.* at 2 (Exhibit D) (emphasis added). Both the resolution language and the ballot language explicitly reference METRORail "commuter line components." As noted earlier, the commuter line component has different rail segments, one of which is the Uptown/West Loop segment described as "[a]pproximately 4.4 miles north from Westpark along Post Oak Blvd. and the West Loop 610 to the Northwest Transit Center. Serves the Galleria and Uptown businesses on Post Oak Boulevard. This segment or line will have approximately 7 stations." *Id.* at 1 (Exhibit A-4). The plain language of the election order and the ballot language clearly indicate that METRO intended some portion of the bond proceeds to be spent on commuter line components. Similarly, the exhibits incorporated into the resolution calling for the special election clearly identify which of the particular rail components were to benefit from the bond proceeds. *See id.* (Exhibits A & A-4). Thus, a court would likely determine that METRO's contract with the voters included the expenditure of a portion of the bond proceeds on the Uptown/West Loop 4.4 mile rail segment. *See Fletcher*, 53 S.W.2d at 818 (stating that when the voters approve a specific project, "the proceeds of the bond issue are 'earmarked' with the character of a trust fund which may not be diverted to another purpose or project . . . .") (citing *Black v. Strength*, 246 S.W. 79 (Tex. 1922)).

In briefing submitted to this office, METRO argues that its contract with the voters comprises only section 14 of the Notice of Special Election, entitled METRO's Agreement with the Voters, which section does not contain a requirement for rail only on Post Oak Boulevard.[4] Yet, section 14 refers to and incorporates by reference Exhibit A-4, which describes 4.4 miles of light rail along Post Oak Boulevard. *See* Notice of Special Election, METRO, at 1 (Resolution No. 2003-93 & Attachment 1, Resolution No. 2003-77) (Exhibit A-4). A court would likely

---

[4]*See* Brief from Alva I. Trevino, Gen. Counsel, METRO at 5–6 (Nov. 10, 2015) (hereinafter "METRO Brief") (on file with the Op. Comm.).

consider the entirety of the order and notice of the election to determine the nature of the contract made by the voters. *See generally City of San Antonio v. Headwaters Coal., Inc.*, 381 S.W.3d 543, 552 (Tex. App.—San Antonio 2012, pet. denied) (determining that the plain language of the bond ordinance constitutes the contract with the voters). In addition, METRO argues that "[v]oter approval of the planning and construction of additional light rail lines and bus service expansions was needed" only to satisfy Houston City Charter requirements. METRO Brief at 4. METRO asserts it "did not need voter approval to construct light rails, but it was required to get City of Houston approval to utilize rail on Houston's city streets." *Id.* The Transportation Code authorizes metropolitan rapid transit authorities to "call an election to determine the voters' will on any issue that the board is authorized to decide under this chapter or on the exercise of any discretionary power of the board under this chapter." TEX. TRANSP. CODE § 451.072(b). Importantly, this provision allows the board to "specify whether the results of the election are binding on the authority." *Id.* In submitting the question of light rail to the voters in the 2003 election, METRO submitted the proposition as a binding one. These arguments are unavailing.

Whether METRO's participation in the Project violates that contract it made with the voters is a separate question. The voters must receive "substantially the benefits expected by them when they cast their votes." *Thayer v. Greer*, 229 S.W.2d 833, 836 (Tex. Civ. App.—Amarillo 1950, writ ref'd n.r.e.). In determining whether a governmental body violates its contract with the voters, "[t]he law does not require a literal performance, but there must be left to the parties substantially the benefits expected." *Fletcher*, 53 S.W.2d at 821. If there is a change in the use of the proceeds as approved by the voters but "the changes have not materially detracted from these benefits," courts will generally find that there has been substantial compliance with the "contract." *Id.* The question whether METRO's participation in the Project ultimately violates its contract with the voters will require the resolution of several fact questions, including questions regarding the actual expenditure of the bond proceeds and whether the Project will prevent the development of the promised rail segment,[5] and is beyond the purview of an attorney general opinion. *See* Tex. Att'y Gen. Op. No. GA-0876 (2011) at 1 (noting that this office does not resolve disputed fact questions in attorney general opinions).

---

[5]In connection with a previous request for an attorney general opinion, RQ-1217-GA (2014), which was subsequently withdrawn, METRO acknowledged that it "cannot agree to build a bus line to the exclusion of the METRORail that the voters specifically approved." *See* Letter and brief from Honorable Vince Ryan, Harris Cty. Att'y, to Honorable Greg Abbott, Tex. Att'y Gen. at 4 (Aug. 28, 2014) (on file with the Op. Comm.).

## S U M M A R Y

A court would likely determine that the Metropolitan Transit Authority's contract with the voters included the expenditure of a portion of the bond proceeds on the Uptown/West Loop 4.4 mile rail segment. Whether METRO's participation in the Uptown Houston Transit Project violates that contract with the voters requires the resolution of fact issues that are beyond the purview of an attorney general opinion.

Very truly yours,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

BRANTLEY STARR
Deputy Attorney General for Legal Counsel

VIRGINIA K. HOELSCHER
Chair, Opinion Committee

CHARLOTTE M. HARPER
Assistant Attorney General, Opinion Committee